UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ARTHUR NIGRO,

                Petitioner,                15-cv-3444 (PKC)
                                                  14-cv-9534 (PKC)
      -against-                             09-cr-1239 (PKC)

                                                  MEMORANDUM
                                                  AND ORDER

UNITED STATES OF AMERICA,

                Respondent.
-----------------------------------------------------------x
-----------------------------------------------------------x
FOTIOS GEAS,

                Petitioner,

     -against-

UNITED STATES OF AMERICA,

                Respondent.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

        Arthur Nigro and Fotios Geas have each filed a motion to vacate, set aside, or correct a sentence pursuant to 28 U.S.C. § 2255 (the "Motions"). Nigro asserts that the government suppressed exculpatory information in violation of his right to due process, and that he was deprived of effective assistance of counsel guaranteed by the Sixth Amendment. Geas asserts that he was deprived of effective assistance of counsel at trial and on appeal, as well various other violations of his due process rights. For the reasons set forth below, Nigro and Geas's Motions are denied.

BACKGROUND

On February 17, 2010, an Indictment was unsealed charging movant Arthur Nigro and five other defendants with crimes including those related to their activities with the Genovese Organized Crime Family (the "Genovese Crime Family"), including the murder of Adolfo Bruno. (09 cr 1239 (PKC), Dkt. No. 5.) A Superseding Indictment was filed on March 9, 2010, adding additional charges against Nigro, and charging movant Fotios ("Fred") Geas with various crimes related to his association with the Genovese Crime Family. (09 cr 1239 (PKC), Dkt. No. 23.) Prior to trial, indicted defendant Anthony Arillotta entered a plea of guilty pursuant to a cooperation agreement. Thereafter, the grand jury returned a series of superseding indictments culminating in the S5 Indictment filed on January 20, 2011. (09 cr 1239 (PKC), Dkt. No. 115.) Ultimately, Nigro was charged with racketeering, racketeering conspiracy, murder of Adolfo Bruno in aid of racketeering, murder of Adolfo Bruno to obstruct justice, extortion conspiracy, and interstate travel in aid of racketeering. Fotios Geas was charged for the aforementioned crimes as well as a second count of murder in aid of racketeering in connection with the murder of Gary Westerman.

Nigro was represented by retained counsel Murray Richman and Lawrence Hochheiser in pretrial proceedings and throughout trial. Frederick H. Cohn was appointed counsel pursuant to the Criminal Justice Act to represent Fotios Geas. (09 cr 1239 (PKC), Dkt. No. 43.) Because Geas was "death eligible," the Court also appointed Harvey Fishbein as counsel learned in the law relating to the death penalty.[1] (09 cr 1239 (PKC), Dkt. No. 36.) After the death penalty was removed from consideration, the Court allowed Fotios Geas to be represented by both Cohn and Fishbein, two senior and experienced members of the Court's CJA

---

[1] Nigro also had been "death eligible" and, for a time, had a third counsel appointed by the Court who was learned in the law relating to the death penalty. (09 cr 1239 (PKC), Dkt. No. 69.)

Panel.  (09 cr 1239 (PKC), Dkt. No. 55.)  In addition, the Court granted Geas's request to allow three paralegals to work on his case.  (09 cr 1239 (PKC), Dkt. No. 89.)

The trial of Nigro and Fotios Geas had originally been scheduled to commence on November 1, 2010.  On August 26, 2010, the Court adjourned the trial date to March 8, 2011 to give counsel adequate time to review discovery and prepare for trial.  (09 cr 1239 (PKC), Aug. 26, 2010 Conf. Tr. 14-17.)  Another brief adjournment was granted, and trial was scheduled to commence on March 14, 2011.  (09 cr 1239 (PKC), Dkt. No. 154.)

Approximately one month prior to trial, the government voluntarily produced its Jencks Act material.  18 U.S.C. § 3500.  (09 cr 1239 (PKC), Feb. 16, 2011 Conf. Tr. 12.)  Defendant Fotios Geas moved for a 90-day adjournment of trial to absorb the material and to hold the Warden of the Metropolitan Detention Center in contempt of an order by this Court granting Fotios Geas improved access to certain discovery materials.  (09 cr 1239 (PKC), Dkt. No. 140.)  The Court held two sessions on the contempt prong, ultimately concluding on February 17, 2011, after the personal appearance of the Warden, that Fotios Geas would have proper and timely access to the materials.   (09 cr 1239 (PKC), Feb. 17, 2011 Conf.)  The Court declined to continue the trial date because it was satisfied that there would be no prejudice to any defendant.  (09 cr 1239 (PKC), Feb. 16, 2011 Conf. Tr. 16-18.)

Trial, in fact, began on March 14 with jury selection and continued for 13 days.  On the second day of deliberations, April 1, 2011, the jury returned a verdict, finding Nigro guilty on five counts and Fotios Geas guilty on six counts; both defendants were acquitted on one count, Count Three, which charged them with the murder of Adolfo Bruno for the purpose of obstructing justice.  The evidence before the jury included the testimony of four cooperating witnesses—Anthony Arillotta and Felix Tranghese, "made members" of the Genovese Family,

and Frankie Roche and Mitchell Weissman, "associates" of the Genovese Family.  In addition to testimonial evidence, the government introduced statements by some co-conspirators obtained through wiretaps, surveillance photographs, phone records, and other physical evidence.

Nigro was sentenced principally to three counts of life imprisonment and 240 months on two counts to run concurrently.  He was also ordered to forfeit $234,000, and a $500 special assessment was imposed.  Geas was sentenced principally to four counts of life imprisonment and 240 months on two counts, also to run concurrently.  He was also ordered to forfeit $120,000, and a $500 special assessment was imposed.  Nigro and Geas each filed timely notices of appeal (09 cr 1239 (PKC), Dkt. No. 226, 229), and the Second Circuit affirmed their convictions.  United States v. Nigro, 529 F. App'x 81 (2d Cir. 2013).  Nigro's petition for panel rehearing, or, in the alternative, for rehearing in banc was denied.  United States v. Arthur Nigro, 11-3821-cr, Dkt. No. 242 (2d Cir. Feb. 18, 2014).  Geas's petition for certiorari was denied.  Geas v. United States, 134 S. Ct. 666 (2013).  Thereafter, the present 2255 motions were timely filed.

DISCUSSION

Nigro contends that the government failed to disclose exculpatory material in a timely fashion in violation of Brady v. Maryland, 373 U.S. 83 (1963).  Nigro also contends that his trial counsel was ineffective.  Geas asserts that he was denied effective assistance of counsel at trial and on his appeal.  In addition, Geas contends that his due process rights were violated by this Court's decision not to disclose certain sealed material from an ex parte proceeding that was held in the District of Massachusetts, and by its imposition of forfeiture.  Moreover, he argues that certain counts of the S5 Indictment were improperly charged in violation of the Sixth

Amendment.  Movants have joined in each other's section 2255 motions in regard to all issues in common.  The Court addresses each of movants' arguments below.

I. Production of Exculpatory Evidence

Nigro contends that the government violated his right to due process by producing 6,000 pages of documents for the first time 33 days before the start of trial.  (Pet'r Nigro Br. 22-23.)  Of the approximately 6,000 pages produced 33 days before trial, over 4,000 pages related to two witnesses who the government advised defense counsel, at least as of February 15, 2011, that it did not intend to call at trial.  (09 cr 1239 (PKC), Dkt. No. 142, at 9.)  Movants have failed to demonstrate that the materials produced 33 days before trial were anything other than routine Jencks Act material with the possible exception of one or two documents that will be discussed. 18 U.S.C. § 3500.  The government need not produce and the Court is prohibited from ordering the production of statements by government witnesses "until said witness has testified on direct examination in the trial of the case."  Id. § 3500(a).  As is customary in this district, the government agreed to an earlier voluntary production and, in this case, that production was much earlier than usual the Thursday before the start of a Monday trial.

The only document or documents, among the 3500 materials, that arguably were Brady material were debriefings of Frankie Roche.  Roche stated that the order to kill Adolfo Bruno came specifically from Port Chester, New York.  (Pet'r Nigro Br., Ex. B).  Roche testified that the order to kill Bruno came from Nigro in New York, but not the Port Chester area.  In context, the reference to Port Chester was likely to John Bologna, an associate of the Genovese Crime Family, who was close to Nigro and, as the defense maintained, to Arillotta.   However, Nigro's trial counsel exploited the issue in cross-examining Roche (Tr. 1452-53) and in closing arguments (Tr. 2032-33.)  Indeed, the information was used as part of trial counsel's overall strategy to deflect blame away from Nigro to Bologna.  In another debriefing, Roche stated that

- 5 -

Anthony Arillotta was known as the "Little Guy," rather than Nigro. (Pet'r Nigro Br., Ex. D). This issue too was probed with Roche on cross-examination (Tr. 1451-52.) Defense counsel also obtained testimony from another government witness, Mitchell Weisman, who testified that Ray Ruggiero was also known as the "Little Guy." (Tr. 400-01.)

Ultimately, the thrust of movant Nigro's argument is that the material in question could have been used to show that Bologna, rather than Nigro, was responsible for the crimes at issue. (Pet'r Nigro Br. 24.) However, trial counsel had the documents 33 days before trial and had other ample evidence which they used to do just that. (See, e.g., Tr. 2033 ("Bologna was misrepresenting his position. All the time, he was the man behind the curtain.").) Furthermore, the government's theory of the case was that Nigro gave orders to others through Bologna, which would not have been inconsistent with the material in question. (Tr. 349, 503.) Therefore, whether the order to kill Bruno came from Bologna or directly from Nigro, the trial outcome would not likely have been different. Strickler, 527 U.S. at 281.

Nor does the fact that some portion of the material produced 33 days before trial was exculpatory necessarily mean that the evidence was suppressed within the meaning of Brady. The government has an affirmative duty to disclose favorable evidence known to it, regardless of whether the defendant has requested disclosure. Brady v. Maryland, 373 U.S. 83 (1963). However, the mere fact that evidence is favorable is not enough to establish a violation of defendant's due process rights. "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [prosecution], either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). Material is "suppressed" within the meaning of Brady if it is not "'disclosed in time for

its effective use at trial.'" United States v. Douglas, 525 F.3d 225, 245 (2d Cir. 2008) (quoting United States v. Coppa, 267 F.3d 132, 135 (2d Cir. 2001)).

The material in question was disclosed in a production of approximately 6,000 pages of documents more than one month before trial. Although the production was sizable, given the length of time that defendant's counsel had to review the material, the Court concludes that it was disclosed in time to be effectively used at trial. Nigro had two retained counsel available to him. Similarly, Geas was represented by two senior members of the Court's CJA panel with Court-approved CJA funding for three paralegals. Both Nigro and Geas had high-quality legal representation, who were capable of reviewing and assessing the impact of the documents. Nigro seeks to compare the present case to United States v. Gil, 297 F.3d 93 (2d Cir. 2002), in which the Second Circuit determined that the disclosure of exculpatory material on the eve of trial constituted a Brady violation. Unlike Gil, however, where more than 2,700 pages of potentially exculpatory material was disclosed on the Friday before trial, Nigro had more than a month to review the material at issue. In Gil, the Second Circuit cautioned disclosure on "the eve of trial;" however, the production in the present case by no means can be construed as having occurred on the eve of trial.

Even if the Roche debriefing material constituted Brady or Giglio material, for the reasons that have been explained, no prejudice arose from its non-disclosure. Coppa, 267 F.3d at 144 ("There is no Brady violation unless there is a reasonable probability that earlier disclosure of the evidence would have produced a different result at trial.").

II. Ineffective Assistance of Counsel

To succeed on a claim of ineffective assistance of counsel in violation of the Sixth Amendment, a defendant must overcome a presumption of effective representation by presenting evidence that counsel's performance fell below an objective standard of reasonableness based on

prevailing professional norms.  Strickland v. Washington, 466 U.S. 668, 688–90 (1984).  If counsel's performance did fall below that objective standard, then defendant must prove prejudice arising from that performance by showing a reasonable probability that, but for counsel's performance, the result of the trial would have been different.  Id. at 693–94.  It is not enough to show that counsel's errors could have "some conceivable effect" on the outcome.  Id. at 693.  Rather, the defendant must show "a probability sufficient to undermine confidence in the outcome."  Id. at 694.

    a. Arthur Nigro

Nigro alleges that his trial counsel was ineffective by: (1) failing to cross-examine Bologna's out-of-court statements pursuant to Rule 806; (2) failing to introduce evidence showing that Anthony Arillotta and Felix Tranghese could not have seen the excerpt from a Presentence Report that led to the order to kill Bruno; (3) failing to cross-examine James Santaniello regarding Nigro's involvement in his extortion; and (4) failing to obtain and introduce evidence of Nigro's incapacitation in 2002.

    1. Impeachment of John Bologna's Hearsay Statements

Nigro contends that his trial counsel was deficient for failing to cross-examine John Bologna.  (Nigro's Br. 32.)  As indicated above, John Bologna was a former associate of the Genovese Crime Family and a cooperating witness for the government.  However, the government did not call him as a witness at Nigro's trial and thus there was no Bologna to be cross-examined.  Of course, he could have been called by the defense, but to call a government cooperator as a defense witness, who would likely refuse to meet with defense counsel before taking the stand, would be, to put it mildly, a high-risk strategy.  Nevertheless, Nigro contends that many of the government's witnesses relied on coconspirator statements and/or hearsay statements of Bologna, and therefore, Bologna's representations to the government that

contradict those coconspirator statements and/or hearsay statements could have been introduced as impeachment evidence pursuant to Rule 806, Fed. R. Evid. Specifically, Nigro argues that his trial counsel should have introduced Bologna's previous statements in which he, among other things, identified Pasquale "Scop" DeLuca, rather than Nigro, as the Boss of the Genovese Crime Family. (Pet'r Nigro's Br. 32-33.)

The Court must be cognizant that it is "ill-suited to second-guess" trial counsel's strategic decisions. United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998). Courts consider the examination of witnesses to fall within the purview of a trial counsel's legal strategy; therefore, decisions related to the nature and scope of cross-examination will generally not support a claim of ineffective assistance of counsel. United States v. Eisen, 974 F.2d 246, 265 (2d Cir. 1992) (holding that trial lawyer was effective, despite failing to thoroughly impeach prosecution witness); United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987) ("Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature."). "[T]he conduct of examination and cross-examination is entrusted to the judgment of the lawyer, . . . and [a court] should not second-guess such decisions unless there is no strategic or tactical justification for the course taken." Luciano, 158 F.3d at 660 (citing Eisen, 974 F.2d at 265).

Here, the decision of Nigro's retained and experienced trial counsel, Messrs. Richman and Hochheiser, not to pursue the requested impeachment of Bologna's hearsay statements does not fall below an objective standard of reasonableness. Trial counsel's strategy, which was evident at trial, was to exploit Bologna's absence from the government's case. In pursuing that strategy, trial counsel deflected blame from Nigro onto Bologna. (See, e.g., Tr. 917-925 (eliciting testimony from Arillotta showing that he received the order to kill Dadabo

from Bologna, not Nigro); Tr. 847 (eliciting testimony from Arillotta showing that he would conduct business through Bologna); Tr. 1636-37 (eliciting testimony from Tranghese showing that Tranghese regularly dealt with Bologna, not Nigro); Tr. 2032-33 (arguing that Bologna was "the guy in Port Chester," which was the location from where the order to kill Bruno originated).) Trial counsel could have reasonably concluded that the use of such impeachment evidence at issue could have harmed, rather than helped their case. While the impeachment evidence would have shown that Bologna did not implicate Nigro as head of the Genovese Crime Family until many years into his cooperation with the FBI, it would have also shown that Bologna explained that he concealed Nigro's role as a boss to protect his identity. (Pet'r Nigro Br., Ex. E.) This is consistent with the government's theory of the case that the Genovese Crime Family "has taken significant steps to protect and insulate its Boss . . . from detection and scrutiny by law enforcement." (S5 Indictment ¶ 7.) Because trial counsel already had ample evidence at its disposal to deflect blame from Nigro to Bologna, among others, the decision not to use the evidence in question was a reasonable strategic decision.

The Second Circuit has cautioned that risky and even ill-advised action is not enough to overcome the presumption of effective assistance of counsel. Tippins v. Walker, 77 F.3d 682, 686 (2d Cir. 1996) ("On that basis, in case after case, we have declined to deem counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox or downright ill-advised."). The decision not to impeach Bologna was strategic, as is evidenced by the fact that Nigro's trial counsel did not call him as witness, despite knowing that the government would not call him months before trial. (Pet'r Nigro Br., Ex. A.) United States v. Eyman, 313 F.3d 741, 743 (2d Cir. 2002) ("A failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel.").

Nor can Nigro show that prejudice arose from failing to impeach Bologna. As discussed above, Nigro's trial counsel already presented substantial evidence attempting to deflect the blame not only to Bologna, but others as well. (See supra; see also Tr. 893 (eliciting testimony from Arillotta which established that Arillotta had told the FBI that he received the order to kill Bruno from Tranghese, not directly from Nigro); Tr. 933-934 (eliciting testimony that Nigro was unaware of crimes committed by other Genovese Crime Family members); Tr. 937-38 (eliciting testimony from Arillotta that he had never seen Nigro in any of the FBI's surveillance photos).) As such, the impeachment evidence at issue would have been unlikely to affect the trial's outcome. Moreover, the government presented substantial evidence supporting Nigro's conviction unrelated to Bologna's out-of-court statements. Even if the jury discredited Bologna's statements, therefore, the Court is confident that the outcome of the trial would have been the same.

Similarly, movant's argument that trial counsel should have introduced the government's earlier Title III wiretap application—in which the government alleged that one by the name of "Artie," believed to be Nigro, was a "soldier" being considered for promotion to a captain—is also unavailing. First, the application only intimates that Nigro *may* be the individual being discussed. Second, aside from the fact that the decision not to cross examine Bologna's hearsay statements with this evidence constitutes a strategic decision, the cumulative evidence presented by trial counsel attempting to prove that Nigro was not in charge makes it unlikely that the wiretap application would have had any impact on the outcome of the trial. In addition, the fact that Nigro was not mentioned in the vast majority of recorded meetings is not substantial, let alone conclusive, proof that he was not a boss of the Genovese Crime Family. Considering that the government's theory of the case was that the Genovese Crime Family "has

taken significant steps to protect and insulate its Boss" (S5 Indictment ¶ 7), it is unlikely that the mere fact that Nigro was not mentioned would have changed the outcome of the trial. Furthermore, trial counsel elicited testimony from Arillotta demonstrating that Nigro was not in any of the surveillance videos that Arillotta had reviewed. (Tr. 937-38.)

        2.   Cross-Examination of Anthony Arillotta and Felix Tranghese

Nigro also alleges that his trial counsel's performance was deficient by failing to impeach Anthony Arillotta and Felix Tranghese's testimony relating to the excerpt from Emilio Fusco's Presentence Report. At trial, the government offered testimony that the decision to kill Bruno originated from the content of one page of Fusco's Presentence Report that could be read as stating that Bruno had told law enforcement officers that Fusco was a "made member" of the Genovese Crime Family. Nigro contends that Arillotta and Tranghese testified that they reviewed the Presentence Report in the spring of 2003, even though the report was not completed until September 2003. Therefore, impeaching Arillotta and Tranghese's testimony would have shown that the witnesses were lying and potentially "compared notes" prior to testifying. (Pet'r Nigro's Br. 58-61.)

Nigro misstates the record. As the government rightfully points out, Arillotta never testified that he saw the Presentence Report in the spring of 2003. In fact, he testified that he first learned of the Presentence Report "during the late summer of '03," which is consistent with when the Report was completed. (Tr. 633.) And while Tranghese initially testified that he saw the Report in the spring of 2003, he later clarified that he first saw the report in the middle of 2003, but was "not sure of the month." (Tr. 1563, 1639.) Based on Arillotta's and Tranghese actual trial testimony, Nigro's contention fails on its face.

Nigro also contends that his trial counsel failed to impeach Arillotta about his testimony related to Geas's alleged contact with Nigro in 2006. In 2006, Nigro contends that he was arrested and placed "on strict pretrial supervision," and that as a result, Geas could not have made contact with Nigro. (Nigro's Br. 66.) But Arillotta explicitly stated at trial that Geas spoke with Nigro "when he was released from prison." (Tr. 768.) Nigro offers no explanation regarding the nature of his pretrial supervision, and why it would have prevented him from contacting Geas. Therefore, the Court concludes that trial counsel's decision not to cross-examine Arillotta on this subject was reasonable.

3. Testimony of James Santaniello

Nigro's claim that his trial counsel was ineffective for failing to impeach Santaniello pursuant to Rule 806 is also without merit. Nigro contends that his trial counsel should have brought out at trial that although Santaniello—a victim of one of defendants' extortion schemes—met with the FBI on several occasions, he never specifically named Nigro as one of his extortionists. The statute under which Nigro was charged and found guilty for extortion, 18 U.S.C. § 1951, does not require the government to prove that Nigro personally extorted Santaniello. Rather, all that is required, and what is alleged in the S5 Indictment, is that Nigro "did combine, conspire, confederate, and agree together with others to commit extortion." (S5 Indictment, at 30.) Setting aside any possible deficiency in trial counsel's performance, there is no conceivable prejudice that arose from failing to pursue a line of impeachment that would not disprove the government's case. Accordingly, the likelihood that the overall outcome would have been different under the circumstances is improbable. Strickland, 466 U.S. at 693 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.").

4. Nigro's Incapacitation in 2002

Nigro's claim that trial counsel was ineffective for not calling Dr. Thomas Apuzzo, Nigro's medical doctor, is equally unavailing. Nigro contends that Dr. Apuzzo would have testified that he was hospitalized from May 2002 through June 18, 2002 for a heart attack, and was subsequently ordered to bedrest for much of 2002. (Nigro's Br. 62-64.)

The Court will not second-guess trial counsel's strategic decision to question the government's witnesses about Nigro's health, rather than calling Dr. Apuzzo. Eyman, 313 F.3d at 743; United States v. Schmidt, 105 F.3d 82, 90 (2d Cir. 1997) ("[T]he tactical decision of whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation."). Trial counsel questioned both Tranghese and Weissman about Nigro's health, including about his heart attack in 2002. (Tr. 398-400, 1651.) Furthermore, based on Dr. Apuzzo's affidavit, it is far from clear that Dr. Apuzzo would have been more effective in showing that Nigro was unable to serve as a boss of the Genovese Crime Family. Dr. Apuzzo only affirms that Nigro was hospitalized from May 2002 to June 18, 2002. While he also states that he "ordered" Nigro to bedrest in the subsequent months, there is no evidence that Nigro followed those orders. Nor has Nigro submitted any additional evidence showing that he was in fact incapacitated following his hospitalization. Therefore, Dr. Apuzzo's testimony would have only proved that Nigro was incapacitated for a short period of time in 2002, which fails to disprove the government's claims against Nigro.

b. Fotios Geas

Geas also alleges deficiencies in the performance of both his trial counsel and appellate counsel. Specifically, Geas alleges that his trial counsel failed to sufficiently prepare for trial due to the Court's denial of a continuance, and failed to convey his wish to discuss a plea deal with the government. Geas also alleges that his appellate counsel was deficient by: (1)

misrepresenting his experience in RICO cases; (2) failing to participate in oral argument; and (3) failing to file a petition for rehearing en banc.

      1.   Trial Counsel Performance

Geas's initial ineffective assistance claim arises from the Court's denial of a motion to continue the trial to a later date. Geas contends that the failure to allow the trial to be continued to a later date rendered his counsel's performance ineffective. (Geas's Br. 4-5.) Geas fails to mention that the Court granted a generous four-month continuance to allow the parties additional time to prepare for trial. (09 cr 1239 (PKC), Aug. 26, 2010 Conf. Tr. 14-17.) Although the Court denied a request for an additional continuance, that decision "is a matter traditionally within the discretion of the trial judge.'" Nigro, 529 F. App'x at 82 (quoting United States v. O'Connor, 650 F.3d 839, 854 (2d. Cir. 2011)). Moreover, Geas has failed to articulate how his attorneys were deficient as a result. Cf. Billy-Eko v. United States, 8 F.3d 111, 118 (2d Cir. 1993) (rejecting petitioner's claim that counsel failed to adequately consult with him, where petitioner failed to "point to any specific act his attorney should have performed to prepare the defense better"), abrogated on other grounds, Massaro v. United States, 538 U.S. 500 (2003). A review of the record indicates that Geas's trial attorneys—Cohn and Fishbein, two senior members of the CJA panel—were well-prepared for trial and highly effective.

In addition, Geas argues that his trial counsel was deficient by not relaying to the government his wish to pursue a plea bargain. However, "the failure to obtain a plea bargain is not evidence of ineffective assistance of counsel when the record does not contain evidence that one might have been offered." Eisemann v. Herbert, 401 F.3d 102, 109 (2d Cir. 2005) (citing Burger v. Kemp, 483 U.S. 776, 785–86 (1987)). Here, there is no evidence that the prosecutor ever intended to offer Geas, who was charged with participating in two murders for which he

faced mandatory life sentences, a plea agreement acceptable to Geas.  Geas may not "solely rely on his own affidavit but must also present objective evidence to substantiate his claim that he would have accepted a purported plea offer."  Muyet v. United States, No. 01 cv 9371 (PKL), 2004 WL 1746369, at *8 (S.D.N.Y. Aug. 3, 2004); see also Bridges v. United States, No. 04 cv 2715 (HB), 2005 WL 1798084, at *6-7 (S.D.N.Y. Aug. 1, 2005).  Geas has presented no objective evidence supporting his allegation that he would have accepted a plea deal.

        2.   Appellate Attorney Performance

The two-prong Strickland standard also applies to appellate counsel.  Smith v. Robbins, 528 U.S. 259, 285 (2000).  In alleging ineffective assistance of appellate counsel, Geas must prove that appellate counsel's performance was objectively unreasonable, and that absent such performance, defendant's appeal would have been successful.  Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).  In alleging deficient performance, it is not enough that appellate counsel did not raise every non-frivolous claim.  Id.; Smith, 528 U.S. at 285.  Counsel does not have a duty to advance every single argument, but "may select from among them in order to maximize the likelihood of success on appeal." Smith, 528 U.S. at 288 (citing Jones v. Barnes, 463 U.S. 745, 750-54 (1983)).

        A review of appellate counsel's brief confirms that his performance was objectively reasonable.  Appellate counsel advanced a number of non-frivolous arguments, and he intelligently and capably represented Geas's interests.  Geas does not allege, and the Court cannot find, that appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."  Mayo, 13 F.3d at 533.  Geas alleges that appellate counsel misrepresented his experience with RICO cases, and that had he known that, he would have asked for different counsel.  However, whatever the experience of Geas's appellate counsel,

a reading of his filed brief reveals that he understood the specific facts and applicable law sufficiently well to provide objectively reasonable representation.

Geas also argues that appellate counsel's failure to participate in oral argument amounts to constitutional error. However, Geas's counsel explained his rationale for not participating in oral argument. In a letter dated November 15, 2013, Geas's appellate counsel stated that he thought that oral argument "can only hurt a case," and that "I put everything I have to say in my briefs." (Geas's Br., Ex. A.) This letter indicates that the decision to forego oral argument was a strategic decision that was not objectively unreasonable. Smalls v. McGinnis, No. 04 cv 0301(Peck, Magistrate Judge), 2004 WL 1774578, at *32 (S.D.N.Y. Aug. 10, 2004) (holding that appellate counsel's strategic decision to forego oral arguments was objectively reasonable); Vega v. United States, 261 F. Supp. 2d 175, 177 (E.D.N.Y. 2003). Nor has Geas sufficiently alleged how the decision not to participate in oral argument would have changed the outcome of his appeal. Vega, 261 F. Supp. 2d at 177 (holding that petitioner failed to demonstrate that his appellate lawyer's decision not to participate in oral argument prejudiced the outcome).

Geas's argument that his appellate counsel's failure to petition for rehearing amounts to deficient performance is also meritless. Although the Supreme Court has held that criminal defendants have a right to appointed counsel on their initial appeal, "the Court has not found the right to exist with respect to certiorari review and *other discretionary appeals*." Pena v. United States, 534 F.3d 92, 96 (2d Cir.2008) (per curiam) (emphasis added). Petitioning for rehearing is one such discretionary review, one that is disfavored. Rule 35(a), Fed. R. App. P. Because a defendant does not have a constitutional right to pursue such a discretionary review, "he could not be deprived of the effective assistance of counsel by his retained counsel's failure

to file the application [for such an appeal] timely." Wainwright v. Torna, 455 U.S. 586, 588 (1982); see also Ross v. Moffitt, 417 U.S. 600 (1974).

\*     \*     \*

The Court has considered the purported errors committed by Nigro's and Geas's attorneys both individually and "in the aggregate." Lindstadt v. Keane, 239 F.3d 191, 204 (2d Cir. 2001). The Court concludes that Nigro and Geas were both represented by competent and able counsel that provided objectively reasonable assistance. Movants' claims for relief based on the ineffective assistance of counsel are denied.

### III. Fotios Geas's Remaining Claims

In addition to his ineffective assistance of counsel claim, Geas raises a number of other claims that he asserts warrant setting aside his verdict. None of them have merit.

#### a. Release of Transcripts from Ex Parte Hearing

On direct appeal, Geas challenged the Court's ruling not to disclose to defendants sealed material of an ex parte proceeding that was held in the District of Massachusetts. Nigro, 529 F. at 82. Geas renews his challenge, arguing that the sealed material should have been disclosed pursuant to Brady and Giglio. However, the suppression of the sealed material did not "deprive the defendant of a fair trial." Coppa, 267 F.3d at 135. Because the material did not constitute Brady or Giglio material, the government had no obligation to disclose it to the defendants.

#### b. Imposition of Forfeiture

Geas also contends that the "District Court violated Due Process when determining the for[f]eiture amount of $120,000." (Geas Mot., at 4.) However, the Second Circuit has squarely held that "§ 2255 may not be used to bring collateral challenges addressed solely to noncustodial punishments." Kaminski v. United States, 339 F.3d 84, 87 (2d Cir. 2003).

Nor is there any "reason why the presence of a plausible claim against a custodial punishment should make a noncustodial punishment more amenable to collateral review than it otherwise might be." Id.  Accordingly, Geas's claim is not properly raised as seeking relief under § 2255.

    c.   Charges in the Indictment

Lastly, Geas argues that certain counts of the S5 Indictment were improperly charged in violation of the Sixth Amendment.  According to Geas, the use of the phrase "in aid of racketeering" as used in Counts Three and Four is overbroad, and "circumvents a defendant's right to be charge[d] by indictment of all elements constituting an offense." (Geas's Mot., at 8.) Geas does not allege how the use of the phrase "in aid of racketeering" is vague or otherwise unconstitutional.  Furthermore, courts has consistently rejected challenges on vagueness grounds to 18 U.S.C. § 1959.  United States v. Guang Ju Lin, 707 F. Supp. 2d 443, 448 (S.D.N.Y. 2010); United States v. Wei, 862 F. Supp. 1129, 1139 (S.D.N.Y. 1994).  After reviewing the S5 Indictment, the court sees no reason to deviate from those decisions.

Geas also contends that Counts Six and Seven of the S5 Indictment were not properly charged.  Count Six, which charges Geas with an extortion conspiracy pursuant to 18 U.S.C. § 1951, was flawed because it did not identify the victim of extortion.  Count Seven, which charges interstate travel in aid of racketeering pursuant to 18 U.S.C. § 1952, was flawed because it did not identity which facility or business was utilized to perpetrate interstate travel in aid of racketeering.  These contentions do not have merit.  The Sixth Amendment guarantees that ""[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." U.S. Const. amend. VI.  To satisfy these requirements, "'an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'"  United States v. Stavroulakis, 952 F.2d 686, 963 (2d Cir. 1992) (quoting United States v. Tramunti, 513 F.2d 1087, 1113 (2d Cir. 1975)).

Counts Six and Seven track the statutes on which they were based, and sufficiently state the time and place of the crimes charged.

CONCLUSION

For the foregoing reasons, the Motions brought by Nigro (15-cv-3444 (PKC), Dkt. No. 9) and Geas (14 cv 09534 (PKC), Dkt. No. 1) are DENIED. The Clerk is directed to enter judgment for the respondent.

Movants have not made a substantial showing of the denial of a constitutional right and, accordingly, a certificate of appealability will not issue. 28 U.S.C. § 2253; see Blackman v. Ercole, 661 F.3d 161, 163–64 (2d Cir. 2011). This Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and in forma pauperis status is denied. See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
       June 9, 2016